BIOLASE, INC., a Delaware corporation, Defendant/Counterclaim Plaintiff–Below, Appellant/Cross–Appellee,

v.

ORACLE PARTNERS, L.P., a Delaware limited partnership, Plaintiff/Counterclaim Defendant–Below, Appellee/Cross–Appellant.

No. 270, 2014.

Supreme Court of Delaware.

Submitted: June 11, 2014.

Decided: June 12, 2014.

Stephen C. Norman, Esquire, Angela C. Whitesell, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, for Defendant/Counterclaim Plaintiff–Below, Appellant/Cross–Appellee;

Of Counsel: Eric Landau, Esquire, Travis Biffar, Esquire, Kevin H. Logan, Esquire, Jones Day, Irvine, California, for Defendant/Counterclaim Plaintiff–Below, Appellant/Cross–Appellee.

Kenneth J. Nachbar, Esquire, Bradley D. Sorrels, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Plaintiff/Counterclaim Defendant–Below, Appellee/Cross–Appellant.

Of Counsel: Steven E. Cohen, Esquire, Kane Kessler, P.C., New York, New York, for Plaintiff/Counterclaim Defendant–Below, Appellee/Cross–Appellant.

Before STRINE, Chief Justice, BERGER, and RIDGELY, Justices.

STRINE, Chief Justice:

## I. Introduction

This expedited appeal arises out of a dispute in the Court of Chancery under 8 Del. C. § 225 over the membership of the board of directors of Biolase, Inc. ("Biolase"). The Court of Chancery resolved the dispute by finding that the Biolase board of directors currently consists of five directors, including Paul Clark. The Court of Chancery concluded that Clark was appointed to the Biolase board after a previous director, Alexander Arrow, resigned through oral statements at a board meeting on February 28, 2014. Federico Pignatelli, Biolase's Chief Executive Officer and Chairman, planned Arrow's resignation and Clark's appointment to the board, and a press release issued by Biolase after the board meeting quoted Pignatelli as saying he was "thrilled" with Clark's appointment to the board. But Pignatelli quickly reversed course when he learned that Clark had aligned himself with a faction of the board that wanted to remove Pignatelli from his position as CEO. Pignatelli argued that because Arrow's resignation at the board meeting was given orally and was not reduced to writing before Clark was appointed to fill the vacancy created by Arrow's resignation, Clark had not been properly appointed to the board under 8 Del. C. § 141(b).

The appellee, Oracle Partners, L.P. ("Oracle"), Biolase's largest stockholder, brought this action against Biolase seeking a declaration that, among other things, Arrow had resigned from the Biolase board and been replaced by Clark at the February 28, 2014 board meeting. Biolase is, in essence, a nominal party because the underlying question in the litigation involves who properly sits on the Biolase board. Thus, although Biolase is the nominal appellant, we refer to the appellant as the Pignatelli Faction because Pignatelli and the other director loyal to him are directing Biolase's litigation arguments.

Following a long line of Court of Chancery decisions to the same effect, the Court of Chancery rejected the Pignatelli

Faction's legal argument and held that § 141(b) is a permissive statute, that a director may resign by an oral statement, and that there is no requirement that a resignation be in writing.[1] The Court of Chancery also found, as a factual matter, that Arrow resigned at the February 28, 2014 board meeting and was immediately replaced by Clark.[2] Because the Court of Chancery's holding that directors are permitted under § 141(b) to resign by oral statements was not legally erroneous and the Court of Chancery's determination that Arrow resigned at the meeting on February 28, 2014 was supported by substantial evidence, we affirm the Court of Chancery's ruling that Clark was properly appointed to the Biolase board of directors. We also affirm the Court of Chancery's summary denial of Oracle's claim for attorneys' fees, which Oracle failed to advance by presenting the Court of Chancery with supporting arguments in its pre-trial briefing, at trial, or at the post-trial argument.

## II. Background

Biolase, a publicly-traded Delaware corporation, is a medical device manufacturer headquartered in Irvine, California.[3] In early February 2014, Larry Feinberg, the managing member of Oracle's general partner, told Federico Pignatelli that he believed Biolase's board of directors needed more experienced directors. Pignatelli and Feinberg agreed that Paul Clark and Jeffrey Nugent—two independent directors with previous experience—would be good additions to the Biolase board. Pignatelli asked two directors—Alexander Arrow and Samuel Low—to resign so he could appoint Clark and Nugent to fill the vacancies that would be created by their resignations. Arrow and Low agreed, and Biolase's board held a telephonic meeting on February 28, 2014. Before the meeting, Biolase had six directors: Pignatelli, Frederick Moll, Norman Nemoy, James Talevich (collectively, the "Undisputed Directors"), Arrow, and Low. Biolase's Secretary and General Counsel, Michael Carroll, began the meeting by bringing up the resignations of Arrow and Low, which was the first item on the agenda. A discussion occurred regarding the effect that Arrow's resignation would have on the expiration date of his director stock options and, at the end of the discussion, Arrow stated, "Okay, I agree, I go along with that." Arrow testified that he believed that with those words he had resigned from the board. The board then unanimously voted to appoint Clark and Nugent as directors to fill the positions formerly occupied by Arrow and Low.

After the meeting, Carroll provided Arrow and Low with template resignation emails,[4] which both Arrow and Low then sent to Carroll and Pignatelli. On March

1. *Oracle Partners, L.P. v. Biolase, Inc.,* 2014 WL 2120348, at *15 (Del.Ch. May 21, 2014).

2. *Id.* at *16–17.

3. These facts are based on the findings of fact made by the Court of Chancery in its post-trial opinion. *Oracle Partners, L.P. v. Biolase, Inc.,* 2014 WL 2120348 (Del.Ch. May 21, 2014).

4. The emails indicated that both Arrow and Low resigned from the board of directors on February 28, 2014, but purported to be effective as of noon that day, after the board

meeting had concluded. Of course, by that time, the board had held a meeting at which Clark and Nugent were appointed to the board immediately following the discussion of the first agenda item—the resignations of Arrow and Low. There was no evidence as of that date that the board intended to expand the board and create two new seats for Clark and Nugent, rather, it was understood that Clark and Nugent were being appointed to the seats that had had been held by Arrow and Low.

3, 2014, the Monday following the board meeting, Biolase issued a press release announcing that Arrow and Low had resigned on February 28, 2014 and that, on the same day, Clark and Nugent had been appointed to the board to fill the vacancies created by their resignation. Pignatelli was quoted in the press release as being "thrilled" by the new appointments. But Pignatelli's exuberance was short-lived. Later that day, Clark and Nugent—who had become convinced that Biolase's management needed a change—called Pignatelli and asked him to relinquish his position as CEO.

Pignatelli called the other directors to get their reaction to the conversation he had with Clark and Nugent, then Pignatelli called Arrow and Low and asked them to rescind their resignations. Arrow and Low each purported to rescind their resignations on March 3, 2014. Then, on March 6, 2014, Pignatelli instructed someone at Biolase to file a Form 8–K with the SEC stating that the Biolase board had appointed Clark and Nugent and that, as a result of these appointments, there were eight directors on the Biolase board. But the Form 8–K attached the March 3, 2014 press release, which stated that Arrow and Low had resigned from the board on February 28, 2014 and been replaced by Clark and Nugent the same day. Pignatelli scheduled a telephonic board meeting for March 7, 2014 and all eight people claiming to be Biolase directors—the four Undisputed Directors, Clark, Nugent, Arrow, and Low—were invited to dial-in. During the meeting, Nugent moved to remove Pignatelli as chairman and CEO of Biolase. Nugent's motion was seconded, but Pignatelli stated that the motion was out of order and the meeting was continued.

Oracle then filed a claim in the Court of Chancery under 8 *Del. C.* § 225 to determine the composition of Biolase's board of directors. Oracle sought a declaration from the Court of Chancery that the Biolase board consists of the four Undisputed Directors and Clark and Nugent. In opposition, the Pignatelli Faction sought a declaration that only the four Undisputed Directors are members of the Biolase board. In a thorough decision, the Court of Chancery held that the Biolase board consists of the four Undisputed Directors and Clark. In reaching that conclusion, the Court of Chancery rejected the argument advanced by the Pignatelli Faction that 8 *Del. C.* § 141(b) and Biolase's by-laws require a director to resign in writing. Relying upon that legal determination, the Court of Chancery then reviewed the facts carefully and determined that Arrow resigned at the board meeting and that Clark was immediately appointed to fill the vacancy that Arrow's resignation had just created.

But the Court of Chancery held that Low had not resigned during the February 28, 2014 meeting because—although Low attended the board meeting at which a new director was appointed to his board seat after a discussion during which it was clear that Arrow and Low were resigning to create the vacancies that were to be filled by Clark and Nugent—Low did not actually speak during the board meeting and his silent consent to that previously agreed upon course of action was not sufficient to establish his resignation.[5] Because the Court of Chancery found that Low did not resign until after the meeting, the Court of Chancery held that there was no vacancy for Nugent to fill when he was appointed during the February 28, 2014

---

5. The Court of Chancery's decision that Low did not resign during the board meeting was influenced by Low's testimony that he subjec- tively believed that a later written email was necessary to formalize his resignation.

meeting and Nugent was not a member of the current Biolase board.

Nonetheless, the effect of the final judgment entered by the Court of Chancery was that there existed a majority of Biolase directors who had signaled their desire to remove Pignatelli as CEO. Facing imminent removal as CEO, the Pignatelli Faction filed this expedited appeal contesting the Court of Chancery's determination that Clark was a member of the board. Perhaps because the Court of Chancery's determination that Low did not resign until after the board meeting and that Nugent was therefore not appointed in his place did not affect whether a board majority existed that could remove Pignatelli, Oracle did not appeal that adverse ruling. Therefore, we have no basis to consider whether the Court of Chancery's ruling that Low did not resign was correct as a matter of law or supported by substantial evidence. But Oracle did appeal one issue, and argues that the Court of Chancery abused its discretion by entering a final judgment that denied it attorneys' fees, despite Oracle's failure to include an argument in support of such an award in its trial briefs or arguments.

## III. Analysis

■ This appeal comes before us on an expedited basis and both sides contend that there is a need for a prompt decision. We therefore state succinctly the reasons we affirm the ruling of the Court of Chancery on the three issues presented to us: (i) whether the Court of Chancery erred by concluding that 8 *Del. C.* § 141(b) is a permissive statute that does not require a director to resign in writing; (ii) whether the Court of Chancery's finding that Arrow resigned by an oral statement at the February 28, 2014 board meeting was supported by substantial evidence; and (iii) whether the Court of Chancery abused its discretion by denying Oracle an award of attorneys' fees when Oracle never made arguments in support of a fee award in its trial briefs or post-trial arguments. We address each of these issues in turn.

■ First, the Court of Chancery's decision that Arrow could resign from the board of directors by means of an oral statement under § 141(b) is not legally erroneous.[6] We review the Court of Chancery's legal determinations, including its interpretation of a statute, *de novo.*[7] Section 141(b) provides that "[a]ny director may resign at any time upon notice given

---

**6.** In addition to arguing that the Court of Chancery erred in interpreting 8 *Del. C.* § 141(b), the Pignatelli Faction argued that the Court of Chancery also erred in interpreting Biolase's bylaws. Section 3.03 of Biolase's bylaws provides, in relevant part:

> Any director or member of a committee of, the Board may resign at any time upon written notice to the Board, the Chairman of the Board, the Executive Vice Chairman of the Board, the CEO or the President. Unless specified otherwise in the notice, such resignation shall take effect upon receipt of the notice.... The acceptance of a resignation shall not be necessary to make it effective.

Appendix to Opening Br. at A49. The Court of Chancery interpreted this bylaw, which close-

ly resembles the language in § 141(b), in the same manner it interpreted the statute, finding that "'may' in this context can only be interpreted as permissive, not mandatory. Just as under 8 *Del. C.* § 141(b), Biolase's bylaws permit, but do not require, a director to resign in writing. Thus, by necessary implication, a Biolase director may also resign verbally." *Oracle Partners, L.P. v. Biolase, Inc.,* 2014 WL 2120348, at *16 (Del.Ch. May 21, 2014). Thus, our discussion of § 141(b) also applies to the argument the Pignatelli Faction raised under Biolase's bylaws and we affirm the Court of Chancery's interpretation of the bylaw for the same reasons that we affirm its interpretation of the statute.

**7.** *Bay City, Inc. v. Williams,* 2 A.3d 1060, 1061 (Del.2010).

in writing or by electronic transmission to the corporation." Hewing to an unbroken line of decisions dating to 1984,[8] the Court of Chancery held that the word "may" in § 141(b) is permissive and does not mean "may only." [9] The Court of Chancery's interpretation of § 141(b) as taking a permissive approach that authorizes resignation by the means specified, but not ruling out a resignation by other means, is a sensible and reasonable one. Furthermore, we are reluctant to depart from this line of precedent for another important reason. After the Court of Chancery's interpretation of § 141(b) had been announced and adhered to in later decisions,[10] the General Assembly amended § 141(b) on several occasions. Those amendments did not signal any disagreement with the Court of Chancery's interpretation of § 141(b),[11] and therefore the Pignatelli Faction asks us to unsettle a statutory question that the General Assembly presumably believes has been an-

---

**8.** *Boris v. Schaheen*, 2013 WL 6331287, at *17 (Del.Ch. Dec. 2, 2013) ("[T]his Court has interpreted the use of "may" in [§ 141(b)] to mean that it is permissive, rather than mandatory, for a director to resign with written notice. The Court concurs; a director may resign orally. Subsequent actions consistent with an oral resignation can support finding a resignation without written notice.") (internal citations omitted); *General Video Corp. v. Kertesz*, 2008 WL 5247120, at *17–18 (Del.Ch. Dec. 17, 2008) (holding that 8 *Del. C.* § 141(b) does not require written notice to the corporation before a resignation can take effect and finding an oral resignation effective under the statute); *Rypac Packaging Machinery, Inc. v. Poges*, 2000 WL 567895, at *5–6 (Del.Ch. May 1, 2000) (finding that a director had effectively resigned from his position upon providing oral notice of his resignation); *Dionisi v. DeCampli*, 1995 WL 398536, at *8–9 (Del.Ch. June 28, 1995) (holding that a director's oral announcement that he was leaving the company constituted an effective resignation under the statute); *Bachmann v. Ontell*, 1984 WL 8245, at *2 (Del.Ch. Nov. 27, 1984) (stating that, although it was not required to determine whether oral resignations were effective under 8 *Del. C.* § 141(b), the Court of Chancery's inclination would be to find that oral resignations were effective and to construe the statute as "permissive rather than mandatory"); *see also* R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIM, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 4.4 (2014) ("Section 141 now permits a director to resign at any time provided he or she delivers notice in writing or by electronic transmission (including e-mail) of such resignation to the corporation. This does not preclude a director from resigning orally ...") (internal citations omitted); E.L. FOLK, R.

WARD, JR., & E.P. WELCH, FOLK ON THE DELAWARE GENERAL CORPORATION LAW, § 141.05 (2014) ("The Court of Chancery has ruled that an oral resignation can be effective.") (internal citations omitted).

**9.** *Oracle Partners, L.P. v. Biolase, Inc.*, 2014 WL 2120348, at *15 (Del.Ch. May 21, 2014). ("Delaware law generally permits directors to resign verbally.... This Court has long interpreted the word "may" in [§ 141(b)] as permissive rather than mandatory, which necessarily implies that a director may resign in other ways—such as verbally.").

**10.** Although the Pignatelli Faction argues that the Court of Chancery's discussion of the issue in *Bachmann v. Ontell*, 1984 WL 8245, at *2 (Del.Ch. Nov. 27, 1984), was dictum, that is not true of the rest of the Court of Chancery's decisions interpreting § 141(b), which all adopted *Bachmann's* interpretation of § 141(b). *See supra* note 8.

**11.** For example, in 2000, the General Assembly amended § 141(b) as part of a larger set of amendments to the Delaware General Corporation Law that were intended to permit various notices to be made through electronic transmission. The synopsis accompanying the 2000 amendments to § 141 explains that the amendments "permit a corporation's directors to make use of available communication technologies. As amended, subsections 141(b) and (f) permit director resignations and actions by consent to be submitted or taken by electronic transmission." 2000 Del. Laws. ch. 343, synopsis (2000). Nothing in the amendment itself or the synopsis indicates that the General Assembly intended the 2000 amendment to § 141(b) to prohibit oral resignations.

swered in a proper way.[12] Relatedly, we do not embrace the Pignatelli Faction's argument that this Court should impose a special standard of review for evaluating whether a director resigned by oral statements or by other conduct. The Court of Chancery has expertise in resolving difficult corporate cases involving disputes over the composition of boards of directors. We perceive no need for it to be constrained by some special standard of review in this context, rather than permitting it to decide these cases using traditional evidentiary standards.

 Second, there was sufficient record evidence for the Court of Chancery to conclude that Arrow resigned from the board of directors and Clark was appointed to replace him at the February 28, 2014 board meeting. This Court will defer to the factual findings of the Court of Chancery if they are "sufficiently supported by the record and are the product of an orderly and logical deductive process."[13] The circumstances here present one of the clearest cases of a director resignation by means other than a formal writing. The Court of Chancery had abundant evidence to support its factual finding that Arrow resigned. Arrow: (i) discussed his resignation with Pignatelli the evening before the scheduled board meeting and agreed to resign; (ii) attended the February 28, 2014 board meeting knowing that the agenda included his resignation and immediate replacement by a new director; (iii)

discussed his resignation and the effect it would have on his stock options during the meeting itself; (iv) indicated that he agreed to resign at the end of that discussion; and (v) assented to the immediate appointment of his successor. There was thus a strong evidentiary basis to conclude that Arrow resigned at the February 28, 2014 board meeting. That conclusion is further strengthened by the press release announcing Arrow's resignation and Clark's appointment to the board effective February 28, 2014 that was attached to a Form 8–K that Biolase filed with the SEC, which was embraced by the very board faction now claiming that the resignation did not occur. In other words, the Pignatelli Faction asks us to conclude that the Court of Chancery's finding that Arrow resigned is without an evidentiary basis, even though the Pignatelli Faction itself told Biolase's investors that Arrow resigned on February 28, 2014 and was immediately replaced by Clark. But the reality is that there was substantial evidence, including the press release itself, that Arrow resigned during the February 28, 2014 board meeting and was immediately replaced by Clark.

The Pignatelli Faction also argues that, because the board purported to appoint two directors (Clark and Nugent) where there was only one vacancy, there is no logical way to determine which of the two directors the board intended to appoint to Arrow's seat and that, therefore, neither

12. *See One–Pie Investments, LLC v. Jackson*, 43 A.3d 911, 915 (Del.2012) ("Courts have found that where a particular interpretation has been placed on a statute by the court and the legislature at its subsequent meetings has left the statute materially unchanged, it is presumed that the legislature has acquiesced in that interpretation.") (internal quotation omitted); *see also Williams v. Twin City Fire Ins. Co.*, 1998 WL 281277, at *5, n. 28 (Del.Super. May 21, 1998) ("There is a judicially created maxim of statutory construction

that legislative language is interpreted on the assumption that the legislature was aware of existing judicial decisions."); *Scribner v. Chonofsky*, 310 A.2d 924, 926 (Del.Ch.1973) ("[L]egislative language is interpreted on the assumption that the legislature was aware of existing judicial decisions.") (internal quotation omitted).

13. *Schock v. Nash*, 732 A.2d 217, 224 (Del. 1999).

Clark nor Nugent should be appointed to the board.[14] But the Court of Chancery's opinion reveals that its factual finding that Clark was appointed to fill the vacancy created by Arrow's resignation was the product of an orderly and deductive process that was supported by the record. The Court of Chancery examined the draft minutes from the board meeting and based its conclusion that Clark was appointed to fill the vacancy created by Arrow's resignation on the order that the names appeared in the minutes.[15] This was a logical factual finding that was supported by the evidence, and we must defer to it.

Finally, Oracle has cross-appealed, arguing that the Court of Chancery acted outside of its discretion when it entered a final judgment that awarded Oracle its costs under Court of Chancery Rule 54(d), but summarily denied its arguments for attorneys' fees. Oracle contends that in the context of a § 225 action, the Court of Chancery is not empowered to enter a prompt final judgment resolving all claims, but must instead issue a partial final order, and then allow whoever claims to be the winner to present its claims related to an award of attorneys' fees at some later date. We find no merit to this argument. The parties filed pre-trial briefs and the Court of Chancery held both a trial and post-trial argument in this case. Oracle did not take advantage of any of these opportunities to fairly present an argument in support of its request for an award of attorneys' fees. It is common and efficient for parties to argue their merits arguments in their trial briefs and then conclude their brief by presenting an argument why, if they win on the merits, they are entitled to attorneys' fees.[16] Oracle failed to do so. Oracle's argument that the Court of Chancery should enter piecemeal orders in statutory summary proceedings—by entering a partial final judgment on the merits and then holding another round of hearings on fee-shifting—would invite obvious inefficiency and the potential for delay. Thus, the Court of Chancery did not abuse its discretion when it entered a final judgment that denied Oracle's claim for attorneys' fees.

Thus, the judgment of the Court of Chancery is **AFFIRMED**. The stay of the final judgment is lifted and the mandate shall issue immediately.

14. Opening Br. at 33.

15. *Oracle Partners, L.P. v. Biolase, Inc.*, 2014 WL 2120348, at *17 (Del.Ch. May 21, 2014).

16. *See Branson v. Branson*, 2011 WL 1135024, at *1 (Del.Ch. Mar. 1, 2011) ("The Defendants did not assert a claim for attorney's fees in the Pretrial Order, and they did not seek any award of attorney's fees in their post-trial briefing. Moreover, they did nothing else that might have operated to keep alive any claim for attorney's fees. In short, their request was not properly preserved and is now untimely."); *see also Kosachuk v. Harper*, 2002 WL 1767542, at *8, n. 51 (Del.Ch. July 25, 2002) (observing that where a party had sought an award of attorney's fees in the Pretrial order but did not pursue the award during trial or in the post-trial brief, the claim for an award had been waived); DONALD J. WOLFE & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 13.03 (2013) (explaining that the Court of Chancery ordinarily will not award attorney's fees after a trial "if a request for a fee award has not been properly preserved.").