IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OCEAN BAY MART, INC., | § | |
| | § | No. 28, 2022 |
| Plaintiff-Below, | § | |
| Appellant, | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. 2019-0467 |
| THE CITY OF REHOBOTH BEACH | § | |
| DELAWARE, | § | |
| | § | |
| Defendant-Below, | § | |
| Appellee. | § | |

Submitted: July 20, 2022
Decided: September 30, 2022

Before **SEITZ**, Chief Justice; **VAUGHN** and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Chancery Court. **AFFIRMED**.

Richard A. Forsten, Esquire (*argued*), Pamela J. Scott, Esquire, Aubrey J. Morin, Esquire, SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, Delaware, *for Plaintiff-Bellow, Appellant Ocean Bay Mart, Inc.*

Max B. Walton, Esquire (*argued*), Lisa R. Hatfield, Esquire, CONNOLLY GALLAGHER LLP, Newark, Delaware, *Defendant-Below, Appellee the City of Rehoboth Beach Delaware.*

Robert J. Valihura, Jr., Esquire, MORTON, VALIHURA, & ZERBATO, LLC, Greenville, Delaware, *Amicus Curiae* for The Committee of 100.

Paul E. Bilodeau, Esquire, LOSCO & MARCONI, P.A., Wilmington, Delaware, *Amicus Curiae* for The Delaware Chapter of the American Planning Association & The Delaware League of Governments.

**VAUGHN**, Justice:

The Plaintiff-Appellant, Ocean Bay Mart, Inc. ("Ocean Bay"), owns a 7.71-acre parcel of real property located in the City of Rehoboth Beach ("the City"). In June 2015, Ocean Bay submitted a Site Plan to the City proposing to develop the property into 63 residential condominium units. Fifty-eight of the residential units would be detached, single-family dwellings. The other five would be single-family attached units. The common elements would include a clubhouse, a pool, and private streets, referred to as drives. Under the plan, the 7.71 acres would remain a single, undivided parcel. The development would be known as "Beach Walk."

The submission of the Site Plan set into motion a chain of events over whether Beach Walk could be approved as a single, undivided parcel or whether the project had to be subdivided into individual lots corresponding to the residential units. The events included a decision by the City's Building Inspector that the project could not be approved as a single, undivided parcel; a decision by the City's Board of Adjustment overruling the Building Inspector's decision; a decision by the City's Planning Commission, rendered after the Board of Adjustment's decision, that the Site Plan could not be considered unless it was resubmitted as a major subdivision application; a decision by the City Commissioners upholding the Planning Commission; an appeal of the Commissioners' decision to the Superior Court, which reversed the Commissioners; and the City's adoption of three amendments to its zoning code. Two of the amendments were enacted in 2016. The third was enacted

3

in 2019. The Superior Court's decision reversing the City Commissioners also remanded the matter to the City for a determination as to how one of the 2016 amendments applied to Beach Walk, an issue not considered by the Commissioners when they upheld the Planning Commission. However, the 2019 amendment, adopted after the Superior Court remand, settled the issue by making it clear that Beach Walk was subject to the 2016 amendments and had to comply with the City's major subdivision regulations.

Ocean Bay then filed this action in the Court of Chancery, alleging that it had a vested right to have its Site Plan approved substantially in the form submitted without going through major subdivision approval and that the City was equitably estopped from enforcing the zoning code amendments against Beach Walk. After a trial, the Court of Chancery ruled that Ocean Bay did not have a vested right to develop Beach Walk as laid out on the Site Plan and the City was not equitably estopped from enforcing its new zoning amendments. Ocean Bay appealed, and for the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

Ocean Bay's property is the site of the Ocean Bay Mart Shopping Center. It is situated on the eastern side of Route 1 in the City of Rehoboth. Since its heyday in the mid-70s and 80s, the Center has seen increased competition as newer, more modern shopping centers and restaurants north of the Center on Route 1 have been

4

constructed, drawing business away from Ocean Bay Mart and diminishing the Center's appeal. In 2009, Keith Monigle, Ocean Bay's sole owner, began investigating residential options for redevelopment of the property while waiting for longer term leases to wind down. By 2012, Mr. Monigle decided to redevelop the property as residential condominiums. He was interested in organizing the development as a condominium in hopes of avoiding the City's subdivision approval process, which is more arduous and expensive than a site plan approval for condominiums.

In particular, Mr. Monigle was impressed with a condominium project located in the City known as the "Cottages at Philadelphia Place." This project is on property just under one acre in size and consists of eight separate buildings, each a single condominium residence, on one parcel, with the area between the buildings designated as common area and maintained by the condominium association. In 2012, Mr. Monigle retained the engineering firm Pennoni Associates, Inc. to create the condominium Site Plan for Beach Walk.

The property is zoned C-1, that is, Commercial-1. The City's Table of Use Regulations provides that single-family detached dwellings and single-family attached units are permitted in a C-1 district. When Beach Walk was being planned, however, construction of single-family detached dwellings was subject to a footnote in the Table of Use Regulations that provided that "no more than one main building

5

may be erected on a single lot."[1]  This one-main-building footnote did not apply to single-family attached dwellings, two-family dwellings or single-family semidetached dwellings, which are also permitted in the C-1 zone.  It applied only to single-family detached dwellings.

In 2013, Mr. Monigle had Ocean Bay's realtor, Kathy Newcomb, reach out to City officials and inquire about the zoning laws and regulations relating to condominiums.  She set up a meeting in August 2013 with the City's Building Inspector, Terri Sullivan.  Ms. Newcomb attended the meeting with another realtor, Rob Burton, who had a parcel similar to Ocean Bay's for sale and had zoning questions regarding that property.  Ms. Newcomb asked specific questions related to the property Mr. Burton was interested in and general zoning questions that related to Ocean Bay's property.  Neither Ms. Newcomb nor Mr. Burton identified Ocean Bay's property or mentioned it by name.  She also asked questions related to a property "for sale by owner on Scarborough Avenue Extended,"[2] which was a 28,000 square foot lot with similar zoning where the owner wanted to build five dwellings.  After the meeting, Ms. Newcomb confirmed their discussion in a letter to Inspector Sullivan.  A response by Inspector Sullivan via email expressly mentions only R-2 and C-3 districts and states that having one parcel with five homes

---

[1] Rehoboth Beach C. § 270, Attachment 1 - Table of Use Regulations, at 1:3 n.1 (2010).
[2] App. to Opening Br. at A099.

6

was allowable. The Vice-Chancellor found that the email generally indicated that condominium projects did not require subdivision.

In June 2014, Mr. Monigle also had an attorney for Ocean Bay reach out to the City about zoning laws and regulations relating to condominiums. The attorney called and spoke with the City's Solicitor on June 27. In an affidavit, the attorney stated that he asked the City Solicitor "if a residential condominium project had to go through a full 'subdivision' review process, or whether a condominium plan only needed a 'site plan' review."[3] The City Solicitor told him that a proposed condominium plan "would only need to go through a 'site plan' review."[4]

Between 2012 and 2015, Mr. Monigle and Pennoni worked to develop the concepts and layout that would become the Site Plan for Beach Walk. Avoiding a plan that would be considered a subdivision remained a concern. In one email, for example, dated July 7, 2014, Mr. Monigle explained that some of the parking areas within Beach Walk were planned to be available to several residents and visitors and that "[t]his may be something we have to do in order [to] avoid subdivision at the Rehoboth level."[5] In another email, he indicated that one of his goals was "[t]o avoid becoming any sort of subdivision."[6]

---

[3] *Id*. at A101.
[4] *Id*.
[5] *Id.* at B003 (emphasis in original).
[6] *Id.* at B004.

7

As mentioned above, the Site Plan was submitted on June 15, 2015. Prior to submitting a land-use plan, applicants can take advantage of the City's optional Project Concept Review—the purpose of which is to present the general goals of the project to the Planning Commission and receive feedback in the form of "nonbinding written comments and suggestions."[7] Ocean Bay elected not to use this process. On July 2, 2015, less than a month after Ocean Bay's Site Plan was submitted, the Chairman of the Rehoboth Beach Planning Commission called Mr. Monigle and asked why Ocean Bay Mart had not used the Project Concept Review process. Mr. Monigle then emailed Pennoni about the phone call and his decision to forgo the Project Concept Review and described the process as one "where the perspective [sic] applicant lays out his cards and the town then has the opportunity [to] adjust the code!"[8]

On July 29, 2015, a little over a month after the Site Plan was submitted, Building Inspector Sullivan issued a comment letter identifying flaws in the plan. Soon after, Damalier Molina became the new Building Inspector. On September 23, 2015, he issued an additional comment letter regarding the Site Plan, which again identified several flaws. Neither letter called into question the submission of Beach Walk as a single parcel or mentioned any need that Beach Walk undergo subdivision

---

[7] Rehoboth Beach C. § 236-31 C.
[8] App. to Answering Br. at B006.

approval.

At two City Planning Commission meetings in the months following Ocean Bay's submission of its Site Plan, the Chairman of the City's Planning Commission made comments indicating that Beach Walk was not a subdivision. On September 11, 2015, the Chairman mentioned that the Site Plan would be before the Commission soon and stated that "this is not a subdivision . . . [b]ecause you're not subdividing the property."[9] At a November 13, 2015 Planning Commission meeting, the Chairman stated again that Beach Walk "is not [a] subdivision. It is a condo."[10]

On November 20, 2015, however, Inspector Molina issued a comment letter to Ocean Bay stating, apparently for the first time, that the Site Plan was not compliant with the City Code because the 58 single-family detached dwellings violated the no-more-than one-main-building on a single lot requirement contained in footnote 1 to the Table of Use Regulations. In other words, Inspector Molina provided notice to the effect that the proposed Site Plan would need to be carried out as a subdivision rather than as a condominium. The letter also explained that, accordingly, the Site Plan would not be included on the agenda for the Commission's next public hearing. It informed Ocean Bay of its right to appeal the building inspector's determination to the City's Board of Adjustment. Mr. Monigle was

---

[9] App. to Opening Br. at A035.
[10] Id.

unaware of the footnote and it had also apparently gone unnoticed by his representatives, and, initially, by former Building Inspector Sullivan and Building Inspector Molina himself until he noticed it prior to writing his November 20, 2015 letter.

Ocean Bay appealed to the Board of Adjustment. At the hearing before the board on May 23, 2016, Ocean Bay's attorney argued that the language in the footnote in the Table of Use Regulations was ambiguous. The City Solicitor argued that the Table of Use Regulations was "clear and unambiguous with regard to one main building per lot."[11] The Board of Adjustment agreed with Ocean Bay's argument that the footnote was ambiguous, granted the appeal and reversed the decision of the Building Inspector. The minutes of the meeting record the Board's decision as follows:

> Mr. [C.H.] made a motion, seconded by [Ms. M.K.], to grant the appeal to reverse the decision of the Building Inspector.
>
> [The Chairman] clarified that the motion is to overturn the decision of the building inspector and therefore to support the appeal.
>
> [C.H.] – for. He did not want to get too involved with the emotions that have been expressed across the board in the letters and otherwise. There is no question that the language of the Code is ambiguous and confusing. [T.E] – for, for the same reasons as his colleagues. [M.K] – for. She regretted that there is some ambiguity here that the

---

[11] *Id*. at A158.

Board is trying to deal with. This is a justified appeal of this case. [D.P] – for. To say that only one unit can be built on seven acres is ridiculous. Motion carried unanimously.[12]

After the Board of Adjustment rendered its decision, the Planning Commission addressed Beach Walk at its regular meeting held on August 12, 2016. The Commission passed a motion "that the Planning Commission request [Ocean Bay] and any other interested parties to submit to the Planning Commission . . . a legal memo . . . addressing (1) whether [Beach Walk] constitutes a subdivision under the City ordinance, and (2) whether the Planning Commission is bound by the Board of Adjustment's decision[.]"[13]

In September 2016, the City Commissioners began considering ordinances that would resolve the apparent ambiguity created by footnote one in the Table of Use Regulations. Ordinances 1016-02 and 1116-01 were passed in October and November 2016, respectively. Ordinance 1016-02 amended Section 270-46.1.1 of the City Code to require that a building used as a one or two-family dwelling have its primary entrance within 100 feet of a public street. The public interest to be served as recited in that ordinance was effective access to dwelling units by emergency services. Ordinance 1116-01 amended Chapter 270 to delete footnote one in the Table of Use Regulations and add a new section that states: "Within all

---

[12] *Id*. at A159-60.
[13] *Id* at A165.

districts, where permitted, no more than one single-family detached dwelling with its customary non-habitable accessory buildings may occupy or be constructed upon any lot."[14]   The public interest to be served as recited for that ordinance was the desire by the Mayor and Commissioners to affirm the Building Inspector's interpretation of footnote one to the Table of Use Regulations and "to remove any uncertainty in its application."[15]  These ordinances, if applied to Beach Walk, would require that it go through major subdivision approval.  Both ordinances contained a provision stating that they were subject to the pending ordinance doctrine and that the Building Inspector should "reject any new application that is inconsistent with the amendments to Chapter 270 provided in the Ordinance until such time as the Mayor and Commissioners take action on the Ordinance."[16]  Thus, while any new land-use application that did not comply with the 2016 ordinances was to be rejected while action on the proposed ordinances was pending, the ordinances did not expressly address their retroactive effect on the pending Beach Walk Site Plan.

While the 2016 Ordinances were under consideration, several City officials indicated that they would not apply to Beach Walk.  A local newspaper reported on September 6, 2016, that the City's Mayor commented that "the proposed changes [would] not apply to the Beach Walk project because it would be considered

---

[14] *Id.* at A174.
[15] App. to Opening Br. at A173.
[16] *Id.* at A172, A174.

grandfathered."[17]  At a September 7, 2016 public workshop concerning possible amendments to the Code, a Commissioner and the City Solicitor also made statements inferring that the 2016 Ordinances would not apply to the Beach Walk application.

On October 21, 2016, the Planning Commission met and discussed the legal memos that it had requested at its August 12 meeting.  Persons who had filed memos were given an opportunity for additional comment.  The Commission then voted unanimously "that it would treat the Beach Walk Application . . . as a major subdivision."[18]  The Commission then tabled its decision to give Ocean Bay an opportunity to respond to its decision.

At a Planning Commission meeting held on December 9, 2016, Mr. Monigle advised the Commission that "he has no intention at this time to file for a major subdivision" and that "[h]e would like to proceed with site plan review."[19]  At a meeting held on January 13, 2017, the Commission passed a motion giving Ocean Bay 60 days to file a major subdivision application or request additional time to do so.  Failure to do so would result in the decision of the Commission not to consider the Site Plan as submitted being deemed final.

Ocean Bay appealed the Commission's decision to the City Commissioners.

---

[17] *Id*. at A168.
[18] *Id*. at A176
[19] *Id*. at A038.

At a hearing before the Commissioners, the Planning Commission argued that the Delaware Uniform Common Interest Ownership Act ("DUCIOA") provides that each unit in a condominium "constitutes, *for all purposes*, a separate parcel of real estate."[20] From this, the Commission argued, it follows that Beach Walk created multiple separate parcels of real estate and fell within the City code's definition of a subdivision, which is the "division of a parcel of land into two or more lots."[21]

The Commissioners agreed with the Planning Commission's argument that under the DUCIOA, the Beach Walk plan created multiple separate lots which required subdivision approval. They analyzed the Board of Adjustment's decision as follows:

> The Board of Adjustment's decision does not bar a determination that the Board Walk project is subject to subdivision review. The Board merely concluded that more than one main building is permitted on a single lot at the subject site. It did not speak to whether the application to create "multiple parcels of real estate" pursuant to DUCIOA triggered subdivision review. The features of the proposed development trigger subdivision review, not its form of ownership.[22]

The Commissioners upheld the Planning Commission by a vote of 4-2.

Ocean Bay then filed a petition for a writ of certiorari in the Superior Court in

---

[20] *Id.* at A182 (quoting 25 *Del. C.* § 81-105(b)(1) (emphasis added)).
[21] App. to Opening Br. at A182. The division of a parcel of land into five or more lots constitutes a major subdivision.
[22] *Id*. at A187.

14

which it sought review of the City Commissioners' decision. In a September 19, 2018 ruling, the court reversed the City Commissioners, holding that they "made an error of law when they concluded that [DUCIOA] makes 'Beach Walk' subject to the City's subdivision requirements."[23] The court refused to address an argument made by the City that Ordinance 1116.01 applied to Beach Walk and remanded the case back to the City, reasoning that the City Commissioners had not addressed the ordinance in their decision, and the "issue should, in the first instance, be presented to and decided by the appropriate City officials."[24]

After receiving the Superior Court's decision, the City adopted the third Ordinance relevant to this appeal, Ordinance 0519-01, on May 17, 2019. The Ordinance reads:

> [A]ny application submitted for a major subdivision, minor subdivision, site plan approval, partitioning or other division of land pending at the time of adoption [of] Ordinances 1016-02 and 1116-01 and which are not finally approved as of April 1, 2019 shall comply with all requirements of Ordinances 1016-02 and 1116-01 prior to obtaining final approval and recordation.[25]

This eliminated any doubt that Beach Walk would require approval as a major subdivision and brought proceedings in the City to an end.

Ocean Bay responded by filing this lawsuit in the Court of Chancery. The

---

[23] *Ocean Bay Mart, Inc. v. City of Rehoboth Beach*, 2019 WL 1126351, at *6 (Del. Super. Mar. 12, 2019).
[24] *Id.* at *1, *6.
[25] App. to Opening Br. at A189-90.

complaint contained three counts. The first alleged that Ocean Bay had developed a vested right to develop Beach Walk as a condominium Site Plan because it had begun the approval process before the 2016 and 2019 ordinances were enacted and had spent considerable funds in support of its efforts. The second requested a declaratory judgment permitting Ocean Bay to proceed with its Site Plan free of the effect of any ordinances adopted after June 18, 2015. The third alleged that the City was equitably estopped from requiring it to go through the major subdivision process.

The Vice-Chancellor analyzed Ocean Bay's vested rights argument by applying the balancing test approved by this Court in *In re 244.5 Acres of Land* and *Town of Cheswold v. Central Delaware Business Park*.[26] In *In Re 244.5 Acres*, this Court explained that:

> the test should involve "a weighing of such factors as the nature, extent and degree of the public interest to be served by the ordinance amendment on the one hand and, on the other hand, the nature, extent and degree of the developer's reliance on the state of the ordinance under which he has proceeded …."[27]

"In the final analysis, good faith reliance on existing standards is the test."[28] In *Town of Cheswold,* this Court added that 'the effect of the pace of the development effort'

---

[26] *See Ocean Bay Mart, Inc. v. City of Rehoboth Beach*, 2021 WL 4771246 (Del. Ch. Oct. 13, 2021).
[27] 808 A.2d 753, 757-58 (Del. 2002) (quoting *Urban Farms, Inc. v. Borough of Franklin Lakes*, 431 A.2d 163, 172 (N.J. Super. Ct. App. Div. 1981)).
[28] *In re 244.5 Acres*, 808 A.2d at 758.

is another factor to be considered, "because 'delay may defeat a vested rights claim.'"[29] In a footnote, the Court also set forth some specific factors a court may consider in applying the test set forth in *In re 244.5 Acres*.[30]

The Vice-Chancellor described the test set forth in these cases as an "equitable balancing. The primary focus," he reasoned, "is the reason the ordinance has been amended, balanced against the reasonable reliance costs to the property owner."[31]

After applying the balancing test set forth in *In re 244.5 Acres* and *Town of Cheswold*, the Vice-Chancellor concluded that the 2016 Ordinances represented an "exercise of the City's police powers, in the public interest[,]"[32] and "the Plaintiff did not reasonably rely on the prior City ordinances such that his rights became vested."[33] The Vice-Chancellor also rejected Ocean Bay's equitable estoppel argument.[34]

The Vice-Chancellor found that Ocean Bay had "expended a substantial sum of money pursuing this development, hoping to proceed without subdivision."[35]

## STANDARD OF REVIEW

"We will not overturn the Court of Chancery's factual findings unless they

---

[29] 188 A.3d 810, 822 (Del. 2018) (quoting *Salem Church (Del.) Assocs. v. New Castle Cnty.*, 2006 WL 2873745, at *11 (Del. Ch. Oct. 6, 2006)).
[30] *See Town of Cheswold*, 188 A.3d at 822 n.62.
[31] *Ocean Bay Mart*, 2021 WL 4771246, at *7.
[32] *Id.* at *8.
[33] *Id.* at *1.
[34] *Id.* at *12-13.
[35] *Id.* at *12.

17

are clearly erroneous."[36]  "Factual findings are not clearly erroneous 'if they are sufficiently supported by the record and are the product of an orderly and logical deductive process.'"[37]  Whether an equitable remedy was applied or not applied using the correct standards is a question of law that we review *de novo*, but in the application of the correct legal standard to the facts of the case before us, our review is for abuse of discretion.[38]  To the extent that Ocean Bay challenges the Court of Chancery's legal conclusions or raises questions of statutory interpretation, we review both questions of law and statutory interpretation *de novo*.[39]

## DISCUSSION

Ocean Bay raises three claims on appeal.  Its first claim is that the Court of Chancery erred because (1) Ocean Bay relied in good faith on the City's past application of its code and representations from City officials that Beach Walk did not require approval as a subdivision; (2) when the Board of Adjustment ruled in favor of Ocean Bay, its rights were vested and protected against subsequent actions by the City; and (3) since ambiguous provisions are interpreted in favor of a landowner, the owner can reasonably rely upon ambiguous land use regulations.

---

[36] *Bäcker v. Palisades Growth Capital II, L.P.*, 246 A.3d 81, 94 (Del. 2021) (quoting *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1043 (Del. 2014)).
[37] *Id.* at 94–95 (quoting *Biolase, Inc. v. Oracle P'rs*, 97 A.3d 1029, 1035 (Del. 2014)).
[38] *Id.* at 95 (citing *Siga Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 341 (Del. 2013)).
[39] *Clark v. Clark*, 47 A.3d 513, 517 (Del. 2012).

Ocean Bay's second claim is that the Court of Chancery erred because the 2016 ordinances did not apply retroactively to its pending Site Plan and it was entitled to rely upon the language in the ordinances stating that the Building Inspector was not to accept any new applications which were inconsistent with the proposed new ordinances until such time as the Mayor and Commissioners act upon them.

Ocean Bay's third claim is that the Court of Chancery erred in not finding that the City was equitably estopped from applying the 2016 ordinances to Beach Walk.

Preliminarily, Ocean Bay, with the support of the Committee of 100[40] as *amicus curiae*, contends that the test for finding a vested right in a land use development should not be "equitable balancing," a phrase used by the Vice-Chancellor in applying the test set forth in *In re 244.5 Acres* and *Town of Cheswold*.[41] The test, they contend, should be "good faith reliance on existing standards."[42] All ordinances, they contend,

> are, presumably, enacted in the public interest, and, in particular, a local government determined to stop an unpopular project, can always put forth some seemingly compelling reasons unrelated to a particular project that

---

[40] The Committee of 100 is a non-partisan, non-profit association of Delaware business leaders that works to promote responsible economic development and address issues that affect Delaware's economic health.

[41] *See Ocean Bay Mart, Inc. v. City of Rehoboth Beach*, 2021 WL 4771246, at *7 (Del. Ch. Oct. 13, 2021).

[42] Opening Br. At 24; Committee of 100's Br. At 12.

justifies the additional regulation or change (and which, it just so happens, also acts to block the unpopular project).[43]

The City argues in response that "[t]here is no bright line or objective formula for determining whether vested rights attached – rather the Court must engage in equitable balancing – and that is precisely the analysis that the [Court of Chancery] undertook."[44]

The finding of a vested right to complete a land use project is meant to protect a property owner against an amendment to a zoning law that renders a project nonconforming where the property owner reasonably and in good faith relies upon existing law at the time the project is initiated and spends substantial sums or incurs significant obligations on the project.[45] We reaffirm that the proper test to be applied in determining whether a property owner has established a vested right is the balancing test set forth by this Court in *In re 244.5 Acres*. In applying that test, the evaluation of the "nature, extent, and degree of the public interest to be served"[46] by the zoning amendment may take into account as a factor, in addition to other factors such as those set forth in *Town of Cheswold,[47]* evidence that an amendment is

---

[43] Committee of 100's Br. at 4.
[44] Answering Br. at 25.
[45] Edward H. Ziegler et al., *4 Rathkopf's The Law of Zoning and Planning* §70:20 (4th ed. 2018).
[46] *In re 244.5 Acres of Land*, 808 A.2d 753, 757 (Del. 2002).
[47] *See Town of Cheswold v. Central Delaware Business Park*, 188 A.3d 810, 821-822, n.62 (Del. 2018).

20

motivated by vocal opposition to a project rather than strong public interest concerns.

It appears to us in this case, however, that the decisive factor in the Vice-Chancellor's decision was his finding that Ocean Bay did not reasonably rely upon the City's zoning law as it existed prior to passage of the 2016 amendments.[48] In reaching this conclusion, the Vice-Chancellor stated that

> [t]he real gravamen of the issue here is the extent of the Plaintiff's reliance on existing law, and the reasonableness of that reliance under the circumstances. Assessing the nature, extent, and degree of the developer's reliance on the prior ordinance is critical to resolving the question of whether vested rights exist, as the *In re 244.5 Acres* Court identified when it stated that good faith reliance on the existing standards was the "final analysis."[49]

The balancing test articulated in *In re 244.5 Acres* and *Town of Cheswold v. Central Delaware Business Park* was the correct law to apply, and we find that the Court of Chancery identified that law correctly. Since the Court of Chancery applied the correct law, we review the Vice-Chancellor's application of the law to the facts for abuse of discretion.[50] We now return to Ocean Bay's first claim.

In its first claim of error, Ocean Bay Mart argues that the Chancery Court erred when it found that it did not reasonably rely on past condominium projects or

---

[48] *See Ocean Bay Mart, Inc. v. City of Rehoboth Beach*, 2021 WL 4771246, at *1, *13 (Del. Ch. Oct. 13, 2021).

[49] *Id.* at *8 (quoting *In re 2.44 Acres*, 808 A.2d at 758).

[50] *See Bäcker v. Palisades Growth Capital II, L.P.*, 246 A.3d 81, 95 (Del. 2021) (citing *Siga Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 341 (Del. 2013)).

representations made by City officials before the Site Plan was filed. It contends that it engaged in a lengthy project leading up to submitting its Site Plan, including reviewing the Code and other projects and speaking with City officials–specifically Inspector Sullivan and the City Solicitor. Ocean Bay asserts that there is no question it was acting in good faith when it "(i) reviewed other condominium projects in the City that featured exactly what Ocean Bay proposed, and (ii) specifically asked the Building Inspector about the Footnote and was told, in writing, that it did not apply to condominium projects."[51]

Before addressing this argument specifically, however, we think it must be said that when the Beach Walk Site Plan was submitted, a substantial question existed, although apparently unperceived at that time, as to whether the Plan complied with the City's existing law. The Table of Use Regulations provided that single-family dwellings were permitted in a C-1 district, but subject to the requirement that no more than one main building could be erected on a single lot. The Site Plan could easily and reasonably have been viewed as creating 58 "main building" single-family residences on a single lot in violation of the "no more than one main building" requirement.[52] This view of the one-main-building provision is precisely the view that Building Inspector Molina arrived at before submitting the

---

[51] Opening Br. at 26.
[52] Rehoboth Beach C. § 270, Attachment 1 - Table of Use Regulations, at 1:3 n.1 (2010).

Plan to the Planning Commission. As the Vice-Chancellor correctly observed, "[u]nlike more typical vested rights cases, this is not a situation where the law *ante* clearly permitted a use, later prohibited by new legislation."[53] Although Ocean Bay was unaware of the one-main-building provision, it is charged with knowledge of it for determining reasonable reliance.[54]

Ocean Bay contends that the one-main-building provision did not create a complication for the Beach Walk Site Plan because Ocean Bay relied in good faith on the City's past application of its code and representations from City officials that Beach Walk did not require approval as a subdivision. However, Ms. Newcomb's conversation with Ms. Sullivan and Ms. Sullivan's subsequent "written interpretation"[55] never mentioned Beach Walk or Ocean Bay Mart. While Ms. Newcomb's colleague asked specific questions related to his property, Ms. Newcomb, the record would suggest, merely asked general questions about the zoning laws applicable to R-2 and C-3 districts, as well as questions about the Scarborough Avenue property. Ocean Bay contends that Ms. Newcomb asked Ms. Sullivan about the one-main-building footnote and how it relates to condominiums. However, the record does not support that contention. The correspondence with Building Inspector Sullivan does not mention the Table of Use Regulations or the

---

[53] *Ocean Bay Mart*, 2021 4771246, at *9.
[54] *Tucker v. Crawford*, 315 A.2d 737 (Del. Super. 1974).
[55] Opening Br. at 26 (emphasis omitted).

one-main-building per lot requirement. Ms. Newcomb testified that they only discussed the Table of Use Regulations "as it relates to the subordinate nature of the structures."[56]

The Vice-Chancellor considered the discussion and correspondence between Ms. Newcomb and Building Inspector Sullivan and came to the following conclusion:

> Ms. Sullivan's email was not an official, or even an unofficial, approval of Beachwalk itself; in fact, Sullivan never purported to approve the Site Plan, although she also did not suggest that it required subdivision. The August 26 email might have been of some preliminary reliance value to the Plaintiff, but in the context of the further Beachwalk-specific review to come, the Plaintiff could not reasonably rely on the August 26 email as a full and final statement of the law.[57]

As the Vice-Chancellor also observed, "[t]his is particularly so in light of the Rehoboth Code language allowing no more than one detached residence 'main building' on a single lot."[58] We find no abuse of discretion in the Vice-Chancellor's conclusion that Ocean Bay could not reasonably rely on this vague and indirect interaction with Building Inspector Sullivan as a full and final statement of the law.

Similarly, it was not an abuse of discretion to find that Ocean Bay did not reasonably rely on the conversation between Ocean Bay's attorney and the City

---

[56] App. to Opening Br. at A304.
[57] *Ocean Bay Mart*, 2021 WL 4771246, at *10.
[58] *Id.*

Solicitor. In that conversation, the attorney confirmed with the Solicitor that a condominium is not a subdivision and that a condominium is assessed under different standards for purposes of Planning Commission review. We find no abuse of discretion in the Vice-Chancellor's finding that this brief conversation, although "of interest and encouragement" to Ocean Bay, was insufficient to create reasonable reliance that Beach Walk, with 58 single-family dwellings, could proceed as a condominium rather than a subdivision.[59]

As for Ocean Bay's reliance on other condominium projects, the Vice-Chancellor found that Ocean Bay did not offer evidence regarding the facts and circumstances regarding the approvals of these other projects.[60] A generalized knowledge that other projects have been approved will not give rise to vested rights. There is no abuse of discretion in the Vice-Chancellor's determination that the approval of other projects does not support Ocean Bay's claim.

Ocean Bay's second argument in support of its first claim is that when the Board of Adjustment ruled in favor of Ocean Bay, any question about the Site Plan's compliance with the City's code was settled in its favor and its vested right to proceed with its Site Plan was clearly established. However, while the Board of Adjustment's decision gave Ocean Bay a short-lived victory, the Planning

---

[59] *Id.* at *3, 9.
[60] *Id.*

Commission and the City Commissioners began taking steps to adopt the Building Inspector's interpretation of the one-main-building provision. Less than three months after the Board of Adjustment's decision, in August 2016, the Planning Commission openly solicited views from interested parties as to whether it was bound by the Board of Adjustment's decision. A month later, in September 2016, the City Commissioners began their consideration of ordinances that would "affirm the Building Official's interpretation of the . . . [one-main-building per lot] code provision and to remove any uncertainty in its application."[61] These actions should not have come as any surprise to Ocean Bay. There is no indication in the record that Ocean Bay took any significant development steps in reliance on the Board's decision during the four-month period after the Board's decision. Once the Planning Commission began openly questioning whether it was bound by the Board's decision and the City Commissioners began to consider new ordinances consistent with the Building Inspector's view, Ocean Bay was in no position to reasonably rely on the Board' decision.

Ocean Bay's third argument in support of it first claim is that since ambiguous provisions are interpreted in favor of a landowner, the owner can reasonably rely upon ambiguous land use regulations. Ocean Bay claims that under the Vice-Chancellor's ruling, "if a Code provision is ambiguous, the government need simply

---

[61] App. to Opening Br. at A173.

26

amend the Code provision, and the property owner will be bound by that change,"[62] regardless of any reasonable reliance on the ambiguous provision before it was amended. Ocean Bay and the Committee of 100 also argue that this will incentivize local governments to create ambiguity in their zoning laws and regulations, thereby preventing any good faith reliance on the laws and regulations and effectively destroying the vested rights doctrine.

We are unpersuaded by this argument. The principle that an ambiguity in a statute will be resolved in favor of the property owner is a rule of statutory construction. There is no evidence that Ocean Bay relied upon this rule of statutory construction when it formulated its Beach Walk plan. Alleged ambiguity in the one-main-building footnote was first raised by Ocean Bay when it made its arguments to the Board of Adjustment. In addition, a property owner who relies upon an ambiguous zoning provision does so at the property owner's peril. Where uncertainty exists regarding the meaning and application of a zoning provision, no reliance on the provision can be considered reasonable until after the uncertainty is resolved.

Ocean Bay's second claim is that the 2016 ordinances did not apply retroactively to its pending Site Plan and it was entitled to rely upon language in Section 2 of Ordinance 1016-2 and Section 3 of Ordinance 1116-01 that indicated

---

[62] Opening Br. at 29.

that the Building Inspector was not to accept any new applications which were inconsistent with the proposed new ordinances until such time as the Mayor and Commissioners acted upon them. Ocean Bay asserts that "*new* applications would be rejected, meaning, of course, that *pending* applications were unaffected."[63] It contends that it was not until the City further amended its Code in 2019, which clearly made the ordinances applicable to pending applications, that Ocean Bay's good faith reliance could have ended.

We find that the plain language of the 2016 Ordinances is unambiguous and they applied to pending applications, including the Beach Walk Site Plan. The default rule is that ordinance amendments apply to pending applications for building permits.[64] While the City was free to specify that pending applications would be exempt from the new ordinances, it did not do so. The ordinances provided that no new applications that did not conform to the ordinances would be accepted, but they did not provide that they would not apply to pending applications, if the ordinances were enacted. Nothing in the 2016 Ordinances indicates that they would apply only

---

[63] Opening Br. at 31 (emphasis in original).

[64] *See Kejand, Inc. v. Bd. of Adjustment of Town of Dewey Beach*, 1993 WL 189536, at *2 (Del. Super. Mar. 19, 1993) ("Delaware courts follow the majority rule that a subsequently enacted or amended ordinance altering a permitted use to a prohibited or conditional use is valid against a person who submits an application for a permit or acquires a permit prior to enactment or amendment of the ordinance."); Edward H. Ziegler et al., *4 Rathkopf's The Law of Zoning and Planning* § 70:27 (4th ed. 2022) ("In the ordinary case in which a developer's plans are frustrated by an amendment of the ordinance, . . . all prospective developers whose rights under an existing ordinance have not as yet become vested . . . are bound by the amended provisions.").

to new applications once they were adopted. Both ordinances assert that they will "take effect immediately upon [their] adoption by the Commissioners of the City of Rehoboth Beach."[65] The language of Ordinance 1116-02 includes that "[n]o building used in whole or part as a dwelling shall be constructed unless it complies with the following street access requirement."[66] Ordnance 1116-01 states, "Within all districts, where permitted, no more than one single-family detached dwelling with its customary non-habitable accessory buildings may occupy or be constructed upon any lot."[67] None of this language places any limitation on their application and the language is not ambiguous: the Ordinances neither explicitly state nor imply that pending applications are exempt.

Ocean Bay's argument that the ordinances limited the scope of the provisions to only new applications is misplaced. The ordinances merely codified the pending ordinance doctrine, which prohibits landowners from obtaining building permits if the proposed construction would violate any provision of a pending ordinance.[68] The Section 2 and Section 3 provisions applied only when the ordinances were pending and not once the Commissioners took action on them.[69] Sections 2 and 3 were

---

[65] App. to Opening Br. at A172, 74.
[66] *Id*. at 171.
[67] *Id*. at 174.
[68] *Covington v. Bd. of Adjustment of City of Rehoboth Beach*, 2016 WL 7242581, at *5 (Del. Super. Dec. 14, 2016).
[69] App. to Opening Br. at A174 (providing that the any new application that is inconsistent with the amendments will be rejected "until such time as the Mayor and Commissioners take action on the Ordinance.").

therefore inapplicable following the adoption of the ordinances and had no bearing on the scope of the Ordinances.[70]

Ocean Bay's third claim is that the Court of Chancery erred in not finding that the City was equitably estopped from applying the 2016 ordinances to Beach Walk. Because one of the elements of equitable estoppel is good faith reliance, Ocean Bay repeats many of the same arguments that it made in connection with its first claim, that is, that it had a vested right to develop Beach Walk as a condominium on a single, undivided parcel.

In general, equitable estoppel is available "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment."[71]

> To establish estoppel it must be shown that the party claiming estoppel lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; relied on the conduct of the party against whom estoppel is claimed; and suffered a prejudicial change of position as a result of his reliance.[72]

---

[70] The 2019 Ordinance was passed to "conclusively confirm: and "to remove any doubt" that the 2016 ordinances applied to pending applications submitted before their adoption. A189. Comments made by the Mayor, one Commissioner and the City Solicitor indicating that the 2016 ordinances would not apply to Beachwalk are not binding upon a majority of the Commissioners. *In re Kent County Adequate Public Facilities Ordinances Litigation*, 2009 WL 445386 (Del. Ch. Feb. 11,2009, *rev'd on other grounds, Chase Alexa, LLC v. Kent Cnty. Levy Ct.*, 991 A.2d 1148 (Del. 2010).

[71] *Wilson v. American Ins. Co.*, 209 A.2d 902, 903–04 (Del. 1965).

[72] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 275 (Del. 2017) (quoting *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990)).

The Superior Court has recognized, and we agree, that "[t]he doctrines of equitable estoppel and vested rights, although theoretically distinct, are often applied interchangeably by courts throughout the country to reach the same results in similar factual situations."[73]

As discussed in detail above, Ocean Bay has not made a showing of reasonable, good faith reliance on statements made by government officials and past condominium projects. In addition, Ocean Bay could not reasonably rely on the Board of Adjustment's decision that the one-main-building footnote was ambiguous in Ocean Bay's favor because shortly thereafter, and before Ocean Bay had taken any development steps in reliance on that position, the Planning Commission began openly questioning whether it was bound by the decision of the Board of Adjustment, and, shortly after that, the City began taking steps to amend its ordinances to resolve the perceived ambiguity in favor of the position taken by Building Inspector Molina. Ocean Bay Mart could not rely on the text of the 2016 Ordinances because those ordinances did not include any language that exempted the Site Plan. The Vice-Chancellor did not abuse his discretion in finding that the City was not equitably estopped from applying the 2016 ordinances to Ocean Bay's property.

---

[73] *Miller v. Bd. of Adjustment of Town of Dewey Beach*, 521 A.2d 642, 645 (Del. Super. 1986).

## CONCLUSION

For the foregoing reasons, the judgment of the Court of Chancery is

**AFFIRMED**.