RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0230p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

C-VILLE FABRICATING, INC., dba Tarter Industries,
                                    *Plaintiff-Appellant*,


ANNA LOU TARTER SMITH, individually and on behalf
of Fabricating, Inc., dba Tarter Industries, dba Tarter
Management Company, Inc., dba Tarter Gate
Company, LLC, dba Tarter Tube, LLC, et al.,
                                    *Plaintiffs*,                ⎭ No. 24-5324


        *v*.


JOSHUA DONALD TARTER; THOMAS LEWIS GREGORY,
                                    *Defendants-Appellees*.

_____

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:18-cv-00379—Karen K. Caldwell, District Judge.

Argued:  February 6, 2025

Decided and Filed:  August 20, 2025

Before:  THAPAR, NALBANDIAN, and RITZ, Circuit Judges
_____

## COUNSEL

**ARGUED:**  Andrew L Sparks, DICKINSON WRIGHT PLLC, Lexington, Kentucky, for Appellant.  Michael P. Abate, KAPLAN JOHNSON ABATE & BIRD LLP, Louisville, Kentucky, for Appellees.  **ON BRIEF:**  Andrew L Sparks, DICKINSON WRIGHT PLLC, Lexington, Kentucky, for Appellant.  Michael P. Abate, Michael C. Merrick, Burt A. (Chuck) Stinson, KAPLAN JOHNSON ABATE & BIRD LLP, Louisville, Kentucky, for Appellees.

—————————

**OPINION**

—————————

NALBANDIAN, Circuit Judge.   Sometimes family members don't make the best business partners.  And sometimes closely held corporations don't observe corporate formalities.  Combine them and you'll likely get a mess—which is what this case is.

C-Ville Fabricating, doing business as Tarter Industries, is a closely held Kentucky corporation.  Its board has only ever been filled by members of the Tarter family.  In December 2012, members of the family's third generation gifted their shares to their children.  But since then, the corporation has not honored corporate formalities like holding annual shareholder meetings, elections, or board meetings.  As a result, it's unclear who is on the board of directors.

This matters because three shareholders—Anna Lou, Lou Ann, and Douglas Tarter—want to sue Josh Tarter for actions he took while serving (at least to the outside world) as Tarter's president.  They brought Josh's alleged malfeasance to the attention of the possible board members and asked them to vote so the company could sue in its own name.  In the alternative, the three shareholders brought a derivative suit to bring the same claims on behalf of Tarter Industries.  Now, whether these suits can proceed hinges on the board's composition.

We find that because the share transfer was not a resignation, and because Tarter Industries never took a formal act to reconstitute the board, the third generation was the board and its officers at the time of the special meeting.  As a result, the meeting was validly called, the board had a quorum, and a majority of the directors voted to allow Tarter Industries to sue.  As a result, the direct suit by Tarter Industries can proceed.

**I.**

**A.**

The Tarter family runs four interrelated companies that assemble and sell farm and ranch equipment.  Each entity—Tarter Industries, Tarter Management, Tarter Gate, and Tarter Tube (collectively, the "Tarter Companies")—maintains its own persona, with its own board of

directors.  Tarter Industries is headquartered and operates out of Dunnville, Kentucky.  And it's closely held, so corporate control has been in the hands of the Tarter family for four generations.

Relevant here are the third and fourth generations.  The third generation includes Donald and Joy (married), and David and Anna Lou (now divorced).[1]  Donald and Joy once held half of the corporation's outstanding stock, while David and Anna Lou held the other half.  All four served on the board of directors of Tarter Industries and as officers until December 31, 2012.  On that day, David, Donald, and Joy transferred their shares to their kids, the Tarter fourth generation: Donald and Joy's three kids—Keith, Josh, and Nell—and David and Anna Lou's two—Douglas and LuAnn.[2]  Ever since, Tarter Industries' daily operations have been managed between Anna Lou and the children.  Now, Anna Lou is the largest shareholder.

We're here now because of what didn't happen in connection with the share transfers.  There was no election of a new board of directors and no appointment of new officers—either before or after the transfers.  Indeed, after December 2012, Tarter Industries did not hold another shareholder meeting, election, or board meeting, choosing instead to operate functionally "without regard to office or title."  R.1, Compl., ¶ 25, PageID 8.

The bylaws, however, describe how those corporate formalities should have unfolded.  Each shareholder carries a vote equivalent to their "share of voting stock standing."  *Id.* at PageID 100.  The new shareholders should have elected the four-member board that's responsible for the "general supervision, management and control" of the corporation.  *Id.*  Then, the newly elected board should have appointed the four officers:  the president, vice president, secretary, and treasurer.  *Id.* at 102.  In the normal course, this process should have been repeated annually, which is why the company bylaws provide that a director holds his position for "one year or until his respective successor is elected and qualified."  *Id.* at 100–01.  Like directors, officers also hold their position for one year or "until [their] successor is elected and qualified."  *Id.* at 102.

---

[1]Because all the relevant parties share a last name, we refer to each by their first name.

[2]Keith, Josh, and Nell shared equally in the 50% ownership share transferred to them by Donald and Joy.  Doug and LuAnn shared equally in the 25% transferred to them by David.

Historically, there has been universal overlap between shareholders, the board, and the officers—that is, the same individuals wore all three hats. Before the share transfers, the third generation's four shareholders composed Tarter Industries' board of directors and served as its officers: David (president), Donald (vice president), Joy (treasurer), and Anna Lou (secretary).

**B.**

After the functional transition in 2013, Josh Tarter—son of Donald and Joy—became the purported president. In this role, he oversaw manufacturing and buying for the Tarter companies' steel-based products.

To fully leverage the cost savings available from sourcing Chinese products, Josh, along with a Chinese national (Xiaofeng "Eleven" Chen) and Josh's right-hand at Tarter (Thomas "Lew" Gregory), formed Hong Kong QMC Industry Company. QMC acted as a China-based middleman, brokering deals between Tarter and Chinese manufacturers of steel products. Tarter would wire QMC a lump sum to cover both the brokerage fee and the cost of the component parts, and QMC would keep the profit. And ownership of QMC was split: Josh and Lew held over seventy-five percent of the outstanding stock while Chen was a minority owner.

The only trouble was, as currently alleged, neither Josh, Chen, nor Lew told anyone else at Tarter about QMC, that they were majority owners, or that they were making millions from transactions they were brokering on Tarter's behalf. So for this alleged abuse of corporate power, Anna Lou, LuAnn, and Douglas filed suit against QMC and its owners, for themselves, and derivatively for the Tarter Companies.

**C.**

The plaintiff-shareholders first sued in 2017. The court dismissed the complaint under Rule 12(b)(1) and 12(b)(6). The derivative claim failed because the plaintiffs didn't plead that they'd made a demand on the Tarter boards asking them to pursue those claims, or that the demand would have been futile. And as for the individual claims, the court determined that the plaintiffs had not alleged personal injuries apart from the injuries sustained by the companies, so they lacked standing. *Smith v. Tarter*, 305 F. Supp. 3d 733, 739–44 (E.D. Ky. 2018).

The dismissal, however, was without prejudice, so plaintiffs tried to fix the problems. On February 6, 2018, David, Anna Lou, Douglas, and LuAnn issued a letter to every member of the Tarter family about a special meeting to be held on February 22, 2018. Invoking the relevant provisions of the Tarter Industries bylaws, Anna Lou as secretary, along with David as President, signed the notice of the special meeting, explaining it was for the sole purpose of:

> Approving the filing of litigation against Joshua Donald Tarter, Thomas Lewis Gregory, and Hong Kong QMC Industry Company, LTD for certain cla[i]ms including, but not limited to, the claims previously incorporated in to the Complaint filed in . . . *Anna Lou Tarter Smith, et al. v. Josh Donald Tarter, et al.* . . . based on the facts and evidence set forth therein as well as the facts and evidence previously provided to the shareholder[s] and, or, directors over the past sixteen months . . . .

R.30, Notice of Demand, Ex. 1, PageID 638–43. Under the bylaws, a special meeting could be called by the secretary at the direction of the president, or upon written direction of a majority of directors. The notice assumed that David was still president but acknowledged the ambiguity in the board's composition. Operating under the view that the third generation still composed the four-person board, the board met on February 22 at 10:00 a.m. with David acting as president. For this same reason, only David, Anna Lou, and Joy were allowed to vote, and only those three were counted towards the quorum. Anna Lou and David both voted for the suit while Joy abstained. Apparently, Donald rushed to get there but arrived late, so he asked for the vote to be called again but David and Anna Lou refused. LuAnn, Keith, Douglas, JJ,[3] Nell, and Josh, though also present, did not vote and did not object when the vote was called.

So based on this vote, the same three shareholders again filed suit. The new complaint alleged both a direct claim by Tarter Industries and a derivative claim on behalf of the plaintiff-shareholders. The substantive claims included a RICO conspiracy, misappropriation of trade secrets under federal and state law, fraudulent misrepresentation and concealment, unjust enrichment, and breaches of fiduciary duties and corporate opportunity. Josh and Lew again moved to dismiss this complaint. They alleged that the consent-to-suit vote was invalid for two reasons. First, because David was not the president, he had no authority to call the special

---

[3]JJ is a minor character in this case. For a period, she was a co-CEO.

meeting.  And second, there was no quorum because David, Donald, and Joy were no longer on the board after the share transfer.  But the district court denied the motion, concluding that David was still the president and that the board consisted of the third generation because there had never been a vote to transfer leadership.  So the court allowed both the direct and derivative claims to proceed.

After discovery, the parties cross-moved for summary judgment, with both parties focusing on the board's composition.  This time the defendants won.  The district court granted the defendants' motion finding that the vote was invalid because David was neither a board member nor the president (because of the share transfer) and so he couldn't validly call the meeting, vote for the suit, or contribute to a quorum.  *C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-379, 2022 WL 896104, at *9–11 (E.D. Ky Mar. 25, 2022), *amended by*, No. 5:18-379, 2023 WL 2172185 (E.D. Ky. Feb. 22, 2023), *on reconsideration*, No. 5:18-379, 2024 WL 1197864 (E.D. Ky. Mar. 20, 2024), *and reinstated by*, No. 5:18-379, 2024 WL 1197864 (E.D. Ky.).  But the court didn't definitively determine who was on the board, instead noting that:

> Since David was not a director, under any combination of other possible directors the vote to authorize the litigation was still only approved by one director and not a majority.  *Therefore, whether anyone else was or was not a director is not important*, because at most one director voted to approve the litigation, and both the Tarter Industries bylaws and Kentucky law require a majority of directors to approve the filing of a lawsuit in the corporate name.

*Id.* at *11 (emphasis added).[4]  The problem is that if David were not a member of the board because he had resigned by transferring his shares, then the same conclusion must also be true of Donald and Joy, who had transferred their shares at the same time.

So the plaintiffs moved to alter or amend the judgment.  They argued that if David's share transfer was a resignation, then the same was true for Donald and Joy.  Under this view, Anna Lou—who didn't sell her shares—was the only valid member of the board and had authorized the suit.  The district court agreed.  Because Anna Lou, as secretary, had validly

---

[4]The court also concluded that the derivative claim could not proceed because demand had been made and the decision not to authorize the suit was protected by the business judgment rule.

called a special meeting of the single-member board and had voted to allow the litigation to proceed, Tarter Industries had consented to suit. This also made the derivative claim moot.

Defendants responded by filing their own motion to reconsider. They claimed that by adopting the theory that Anna Lou was the sole board member, the district court had judicially amended the complaint because the plaintiffs had not raised this theory in their complaint or motion for summary judgment. On their view, this was a denial of due process because they were denied discovery to disprove the theory.

And again, the court agreed. By granting the plaintiffs' motion to reconsider, the court had effectively judicially amended the complaint. *Tarter*, 2024 WL 1197864, *3–4. The court characterized the plaintiffs' failure to plead the new single-member-board theory as a problem of constitutional standing and held that a "plaintiff's theory of standing must be sufficiently pleaded in the complaint." *Id.* at *3 (citing *Sierra Club v. Morton*, 405 U.S. 727 (1972)). Because the plaintiffs had raised this novel theory for the first time in their motion to alter or amend, they had asked the court to "make arguments for Plaintiffs or to find their route to standing when Plaintiffs did not present this theory to the Court." *Id.* at *4. So the court reinstated its initial decision granting summary judgment to the defendants. *Id.* at *5.

The plaintiffs timely appealed. They maintain that either the direct or derivative suit can proceed.

## II.

We review a grant of summary judgment de novo. *Gambrel v. Knox County*, 25 F.4th 391, 399 (6th Cir. 2022). And we review the grant of a motion to reconsider for an abuse of discretion. *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010).

Whether the direct suit can proceed comes down to whether Tarter Industries consented to sue in its own name. And because a corporation can only consent by board action, we must determine the board's composition. This leads us to the question: Did David, Donald, and Joy's share transfers constitute valid resignations, or did they have to resign formally—in writing or orally?

David, Donald, and Joy intended to resign from the board and as officers, even though they never did so either in writing or orally.  So because Tarter Industries never reconstituted its board or reappointed its officers, the Board remained as it was before the share transfer:  David, Donald, Joy, Anna Lou.  These four also remained officers.  That means there was a valid special meeting, called by the corporation's secretary (Anna Lou), at the behest of the president (David), there was a quorum (three of four directors present), and a majority (David and Anna Lou) voted for the direct suit.  All said, the litigation was validly authorized, and the direct suit can proceed.

**A.**

We start by noting that the evidence in this case is undisputed; the controversy is about the legal implications of that evidence.  As for those legal implications, though a federal question gives us our jurisdiction, corporate law is a creature of the states.  Tarter Industries is incorporated in Kentucky, so we apply Kentucky corporate law.  But Kentucky courts regularly borrow from and incorporate Delaware law to resolve novel legal issues, so decisions from Delaware offer persuasive authority to fill gaps in Kentucky's decisional law.  *Bacigalupo v. Kohlhepp*, 240 S.W.3d 155, 157 (Ky. Ct. App. 2007) ("Delaware has long been a bastion for corporate law and its development."); *see also Allied Ready Mix Co. ex rel. Mattingly v. Allen*, 994 S.W.2d 4, 8 (Ky. Ct. App. 1998).

**B.**

Every corporation is governed by its articles of incorporation, bylaws, and state law. State law sets default rules, but a corporation can set its own rules so long as they are not inconsistent with state law or common law.  *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 407 (Del. 1985); *see Brant v. Turpin*, No. 2018-CA-1074-MR, 2021 WL 1583152, at *7–8 (Ky. Ct. App. Apr. 23, 2021).  Together, the three weave a regulatory framework for corporate conduct, leaving state law to govern when the articles or bylaws are silent.

The resignation questions here are governed in part by the Tarter bylaws and in part by state law.  The bylaws explain that a "director may resign at any time by filing a written resignation with the secretary, and . . . said resignation shall be effective from the filing thereof." R.1, Compl., Ex. A-1, PageID 101.  Directors are to be elected annually and "shall hold office for

one year or until his respective successor is elected and qualified." *Id.* at 100–01. The statutory provision on the "Resignation of directors" similarly provides that a "director may resign at any time by delivering written notice to the board of directors, its chairman, or to the corporation." Ky. Rev. Stat. Ann. § 271B.8-070(1). And that resignation "shall be effective when the notice is delivered unless the notice specifies a later effective date." *Id.* § 271B.8-070(2).

Kentucky also has a general notice provision that applies to the entire corporate chapter. It first provides: "Notice under this chapter shall be in writing unless oral notice is reasonable under the circumstances." *Id.* § 271B.1-410(1). Importantly, where bylaws or articles of incorporation "prescribe notice," those requirements "shall govern" but only if they are "not inconsistent with this section or other provisions of this chapter." *Id.* § 271B.1-410(7).

The bylaws are silent on officer resignations, so state law governs. Notably, an officer "may resign at any time by delivering notice" without specifying the method of that notice. *Id.* § 271B.8-430(1). But by using the general term "notice," presumably, the general statutory notice provision applies. *Id.* § 271B.1-410.

So we turn to the possible board resignations. And first we look at the bylaws to determine whether the share transfers could have resulted in board resignations. Then we ask whether the bylaws, if read that way, are consistent with the statute.

Corporate bylaws are a contract between the director, officer, and shareholder. So we interpret them with the tools of contract interpretation. *Toler v. Clark Rural Elec. Coop. Corp.*, 512 S.W.2d 25, 26 (Ky. Ct. App. 1974); *Hill Int'l, Inc. v. Opportunity Partners L.P.*, 119 A.3d 30, 38 (Del. 2015). And any contract-interpretation question starts with the plain meaning. *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). Under Kentucky law, if a bylaw is unambiguous, it must be "enforced strictly according to its terms." *Id.* (internal quotation marks omitted). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Id.* at 694–95 (internal quotation marks omitted).

The best way to read the director-resignation bylaw is naturally. Start first with the fact that the provision relies on "may." As the dictionary explains, it's a permissive term that

indicates "possibility or probability," or "permission to." *May*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/may (last visited May 30, 2025).  And this tracks how Kentucky courts have interpreted "may" elsewhere in the corporate code. *E.g.*, *Bear, Inc. v. Smith*, 303 S.W.3d 137, 145 (Ky. Ct. App. 2010) ("We conclude that the language of Ky. Rev. Stat. Ann. § 271B.14-060(1) is dispositive, as it states that a dissolved corporation *may* dispose of the known claims against it by following the procedure described in this section.  Here, the 'may' renders this statute permissive, rather than mandatory." (citation modified)); *compare* Ky. Rev. Stat. Ann. § 446.010(26) ("As used in the statute laws of this state, unless the context requires otherwise . . . 'May' is permissive."), *with id.* § 446.010(39) ("As used in the statute laws of this state, unless the context requires otherwise . . . 'Shall' is mandatory.").

That "may" is permissive, however, doesn't resolve whether writing is the exclusive means of resigning.  In other words, the choice to resign is permissive.  But that leaves two possible readings about the *manner* of resignation.  On one reading, a director can resign whenever he wants ("may resign at any time"), but if he resigns, it must be in writing ("by filing written notice").  On the other, a director "may resign at any time," in writing, but that doesn't rule out resigning another way, for example, orally or by conduct.  We think the latter option is the better reading of the bylaws.

To begin, it's the more natural reading of the entire provision.  The provision notably omits any limiting or segmenting punctuation.  *See Lawton v. Commonwealth*, 354 S.W.3d 565, 572–73 (Ky. 2011).  Without a comma to separate the two halves of the sentence, there's no reason to read the provision as anything but a whole.  And without a comma, there's no reason to read the written-filing reference as a standalone requirement.

Perhaps more importantly, to conclude that a written resignation is the exclusive form of resignation would require us to, in effect, add words to the provisions.  We'd have to add terms—like "must," "only," or "but only"—to limit acceptable resignations to those in writing.  In other words, to read the provision to mandate a written resignation, the provision would need to read something like: "may resign at any time [but only] by filing a written resignation."  But our job is to give meaning to the terms authorized by the parties, not to write our own.  Indeed, there is "no better established rule of law" in Kentucky than that "a court cannot make a contract

for the parties, but can only construe the contract it finds they have entered into. Nor has the court the authority to read words into a contract." *Big Sandy Co., L.P. v. EQT Gathering, LLC*, 545 S.W.3d 842, 847 (Ky. 2018) (quoting *Alexander v. Theatre Realty Corp.*, 70 S.W.2d 380, 387–88 (Ky. 1934)).[5]

This natural reading is also supported by persuasive authority. Start first with the Delaware Supreme Court's interpretation of its own, similar resignation statute. The court refused to add words to the statute to turn a permissive "may" into a mandatory "must."[6] Del. Code Ann. tit. 8, § 141(b); *Biolase, Inc. v. Oracle Partners, L.P.*, 97 A.3d 1029, 1033–35 (Del. 2014). There, Biolase's CEO was trying to avoid his own ouster by challenging the oral resignation of one director and the appointment of a replacement director who supported the ouster. The question was whether the statute required a director to resign in writing.

Because there was no limiting or exclusive language like "may only" or "must," the Delaware Supreme Court determined that § 141(b) authorized one form of resignation but did "not rule[] out a resignation by other means." *Biolase*, 97 A.3d at 1033–35. Applying this permissive rule, the court found that the departing director had manifested his objective intent to resign. *Id.* at 1035. This was because the director had discussed his resignation with the CEO, stated his resignation in front of the board, discussed the logistics of his resignation, and assented to the new director whom the board immediately appointed. *Id.*

Wyoming has come to the same conclusion about a similar resignation provision.[7] *Spence v. Sloan*, 515 P.3d 572, 582 (Wyo. 2022) (concluding resignation provision allowed, but

---

[5]We don't think "by" does the work of implying exclusivity to the writing requirement either. Sure, it's a preposition describing the "agency" or "instrumentality" through which the writing should be submitted. *By*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/by (last visited May 30, 2025). But neither definition implies exclusivity. This also supports our plain reading of the statute and bylaws.

[6]Section 141(b) reads: "Each director shall hold office until such director's successor is elected and qualified or until such director's earlier resignation or removal. *Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation.* A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events." (emphasis added).

[7]In the context of model or uniform statutes, the Kentucky Supreme Court has explained that interpretations by other courts can offer persuasive authority on the statute's meaning. *Jefferson Cnty. Bd. of Educ. v. Fell*, 391 S.W.3d 713, 719 (Ky. 2012).

didn't require, resignation in writing based on *Biolase*, treatises, and the official comment to the model nonprofit corporations act).  To be fair, there's a competing view.  *Kemmer v. Newman*, 387 P.3d 131, 135–36 (Idaho 2016) (rejecting *Biolase* and finding that "may" modified only the directors' right to "resign at any time" so if a director resigns, he must do so by "delivering written notice" in similar model nonprofit corporations act (internal quotation marks omitted)).  But we think *Biolase* and *Spence* have the stronger interpretation on the merits and the fact that *Biolase* comes from Delaware helps tip the balance.

If we stopped there, then we'd ask whether the share transfers and surrounding circumstances amounted to board resignations.  And under these circumstances, the likeliest answer would be that David, Donald, and Joy had resigned.  But we can't stop there.  We must ask whether interpreting the bylaws to permit resignation by conduct would be consistent with Kentucky statute.  Ky. Rev. Stat. Ann. § 271B.1-410(7).  And on that front, we say no.

The bylaws and the state statute are virtually identical, so what's the difference?  As we've construed them, the bylaws provide a safe harbor—a written resignation is presumptively permissible, but the bylaws don't foreclose other methods of resignation, *i.e.*, by conduct.  Nevertheless, the Kentucky statute, read in conjunction with the general notice provision, is more limiting.  Yes, the director resignation statute is similar to the bylaws.  And the general notice provision allows for written notice, just like the bylaws.  But while the bylaws are open-ended regarding what other forms might constitute a valid resignation, the general notice provision provides for only one other method of resignation—oral—which it only allows in some circumstances.  *Id.* § 271B.1-410.  So the statute doesn't allow resignation by conduct.

It's true that the general notice provision isn't expressly incorporated by the director resignation provision.  But in Kentucky, if the legislature has defined a term in the statute, that definition controls wherever it appears unless there's some "statutory interdiction." *Camera Ctr., Inc. v. Revenue Cabinet*, 34 S.W.3d 39, 42 (Ky. 2000) (citing *Dixon v. Caudill*, 143 Ky. 623, 136 S.W. 1043, 1044 (1911)).  There are certainly ways that the legislature could have followed the general notice provision in a more straightforward way.  But the statute gives no reason to deviate from the defined term.

In addition, the Kentucky corporate law chapter—and these provisions specifically—is based on the Model Business Corporation Act. *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 553 (Ky. 2011). And the comment to the MBCA's director resignation provision cross-references the MBCA's general notice provision. Model Bus. Corp. Act § 8.07 (1950) (A.B.A., amended 2016) (cross-referencing "Notices and other communications, see § 1.41"). This also suggests that we should interpret the resignation provision consistent with the statutory notice provision.[8]

So we have a general notice provision that contemplates only two ways to give notice—written and oral. The bylaws can't conflict with that general notice provision. And without evidence that the Kentucky legislature or courts have permitted resignation by conduct, we have no reason to extend the breadth of the statute's text.

What about Delaware law? As we noted above, Delaware's resignation provision is not exclusive to written resignation. Instead, the Delaware courts have read that provision in a way that might contemplate conduct-based resignations. In Delaware, a resignation may be valid based on the relevant circumstances and the director's intent—that is, whether he "clearly manifest[ed]" that he "has resigned his fiduciary position." *Villette v. MondoBrain, Inc.*, No. CV 2020-0295, 2020 WL 7706961, at *3 (Del. Ch. Dec. 29, 2020); *see also Oracle Partners, L.P. v. Biolase*, C.A. No. 9438, 2014 WL 2120348, at *16 (Del. Ch. May 21, 2014) ("Although the magic words 'I resign' may not be necessary, there must nonetheless be some objective manifestation of words or actions to that effect." (collecting cases)), *aff'd*, *Biolase*, 97 A.3d at 1033–35.

But Delaware's interpretation doesn't help here for two reasons. First, the cases that *Biolase* cites to support its conclusion that broader forms of notice are allowed all deal with resignations that involved some oral statement suggesting an intent to resign. *Biolase*, 97 A.3d at 1034 n.8. So even though some of the language in the Delaware opinions is broad, the actual

---

[8]Kentucky courts regularly cite to the MBCA and related commentary in construing the related Kentucky provisions. *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 196 n.5 (Ky. 2013), *as modified* (Feb. 20, 2014) (discussing the official comments to §§ 8.30, 8.31); *Bear*, 303 S.W.3d at 145 (discussing the official comment to § 14.06 of the 1984 Model Act).

application is narrower.   Second, and perhaps more significantly, unlike Kentucky, Delaware doesn't have a general notice provision limiting itself to oral and written conduct.

So we conclude that even though a written resignation isn't the only way a director can resign under Kentucky law.  The only alternative, in appropriate circumstances, would be orally. To the extent that we think that the bylaws might allow something broader, that reading would conflict with Kentucky law.   This conclusion about Kentucky's general notice provision similarly applies to the officer resignations since the bylaws are silent.

## C.

Everyone agrees that David, Donald, and Joy didn't provide a written notice of their resignations, nor did they explicitly say they were resigning.   And if we could look at the objective circumstances—transferring their shares and their conduct—we might conclude that they had resigned as directors and officers. Contextual evidence shows that Tarter Industries had presumed that David, Donald, and Joy had resigned as of the share transfer.

For example, annual reports submitted to the Kentucky Secretary of State each year reflect the shift.  Through 2012, the board and officers were listed as David (president), Donald (vice president), Joy (treasurer), and Anna Lou (secretary).   But from 2013 to 2017, the reports listed four new officers: Josh (president), Keith (vice president), Nell (treasurer), Anna Lou (secretary).   (For some unknown reason, after 2013 those annual reports don't list who the directors are.)

Internal emails show that Anna Lou understood the need to formally adjust the corporate leadership.   She emailed with Tarter's accountant about updating the corporate documents. And the two discussed who would lead all four Tarter entities, and in what capacities.  As for Tarter Industries, Josh (president), Keith (vice president), Anna Lou (secretary), and Nell (treasurer) would serve as the corporation's officers and directors.

And the deposition testimony of David, Donald, and Joy confirms that none of them believed they remained on the board after they transferred their shares.  When David was asked whether "it was [his] understanding that when [he] sign[ed] away [his] shares, [he'd] no

longer . . . be a shareholder and director after that time," he said: "Yeah, I'm sure I wouldn't." R.93-2, David Dep. (Ex. 1), PageID 1646. He also said he didn't remember attending a board meeting after he transferred his shares. Joy similarly believed she had "stop[ped] being an owner" at the "end of 2012." R.108-2, Joy Dep. (Ex. B), PageID 2731.

But as compelling as this evidence seems, it's not enough (or rather, it's misplaced). David, Donald, and Joy failed to take the action necessary to resign from their board or officer positions: filing a writing, or saying so orally.[9] And ultimately, they tried to "reactivate" their board memberships by holding a board meeting and voting on the direct suit.[10]

---

[9]To be sure, it may seem oddly formalistic to say that three board members who sold all their shares and gave up all participation in any corporate governance for years remained as a "zombie" board of directors, unacknowledged by anyone. Perhaps there's solace in the fact that if this weren't true, we'd end up with the same result anyway. By that we mean, if David, Donald, and Joy had resigned through their conduct, then Anna Lou would have been the sole remaining board member and corporate secretary. The de facto director doctrine wouldn't have allowed Josh, Keith, Nell, or LuAnn to step into director roles for this dispute about corporate control. 18B Am. Jur. 2d Corporations § 1204; 2 Fletcher Cyc. Corp. § 377; *Porter's Adm'r v. Dulin Oil Co.*, 45 S.W.2d 495, 497–98 (Ky. 1932) ("It is well settled that the acts of de facto officers of a private corporation are binding as to a third person who deals with them in ignorance of their want of legal right to the officer." (internal quotation marks omitted)). So if Anna Lou were the only remaining director, this case would still go forward because as secretary, she would have validly called the meeting, been a majority of the existing directors, and voted for the direct suit.

The district court ultimately rejected this theory because it thought the plaintiffs had to affirmatively plead the one-member-board theory because it was a basis for the plaintiffs' "theory of standing." *Tarter*, 2024 WL 1197864, at *3–4 (citing *Sierra Club*, 405 U.S. 727). But we disagree. Whether a corporation has followed its internal governance rules before authorizing a lawsuit is neither a matter of Article III standing, nor is it something that the corporation must plead under the Federal Rules.

As for Article III, the trial court was correct that the plaintiff carries the burden of "[p]leading and proving standing," and a failure to do so can't be fixed by the court on a motion to reconsider. *Id.* at *3. But Tarter Industries has alleged a monetary injury, that is traceable to Josh and the other defendants, and that the court can remedy. *See Allen v. Wright*, 468 U.S. 737, 752 (1984). So they have satisfied Article III's requirements.

As for pleading, whether a corporation complied with its internal governance requirements before suing is at best an affirmative defense or counterclaim. Fed. R. Civ. P. 8(c), 13. And both must be raised by the defendant. In cases involving corporations where the defendant is a third party outside the corporation, he likely can't properly raise a governance issue. But Josh is a corporate shareholder and perhaps an officer—so such a defense or counterclaim is likely his to raise. *E.g.*, Ky. Rev. Stat. Ann. § 418.045 (declaratory judgment act); *Id.* § 271B.8-300 (business judgment claims against directors); *Id.* § 271B.8-420 (business judgment claims against officers); *Baptist*, 436 S.W.3d at 196 (discussing claims under the business judgment statutes). So no matter how you slice it, the plaintiffs didn't have to affirmatively plead the board's composition.

[10]We hesitate to read too much into this reactivation—but simply note it for completeness. It's true that Fletcher's Cyclopedia says that a board member can revoke a resignation by doing something—like attending a board meeting as a director—after resigning. 2 Fletcher Cyc. Corp. § 350. But that premise is based on the common-law rule that a resignation isn't effective until it's formally accepted by the corporation. So if a director purported to resign but the corporation never accepted the resignation, the director might be able to revoke it and so

Since no one disputes that Anna Lou was always a member of the board because she never sold her shares, and having resolved that David, Donald, and Joy never resigned, the board was validly constituted with the third generation. And since the third generation remained in office, David was still Tarter Industries' president and could call the special meeting. So the board complied with the special meeting requirements described in the bylaws and validly authorized the lawsuit under Kentucky law. The direct suit by Tarter Industries can proceed.

## III.

The shareholder-plaintiffs also brought a derivative suit on the Tarter entities' behalf. A derivative suit allows shareholders to sue on behalf of a company even without the board's consent. *See Sahni v. Hock*, 369 S.W.3d 39, 45–46 (Ky. Ct. App. 2010), *abrogated on other grounds by Baptist*, 436 S.W.3d 189. But a derivative suit is mooted by a direct suit, so we need not address the derivative claim for Tarter Industries. As far as the rest of the C-Ville corporate family is concerned, all we need to address is whether a derivative suit can proceed on Tarter Management's behalf, since it never voted to sue in its own name.[11] And that derivative suit can't proceed.

Before bringing a derivative suit, the shareholder must make a demand on the board giving it notice of the alleged legal rights the shareholder wants the corporation to enforce. *Sahni*, 369 S.W.3d at 45. In so doing, the shareholder forfeits the right to later argue that this

---

"reactivate." That's what happened in the older case that Fletcher's cites for support. *Id.* (citing *Solon Chamber of Com. v. Women's Gen. Hosp.*, 612 N.E.2d 331, 336–37 (Ohio Ct. App. July 6, 1992)).

But the modern view is that resignations are effective when tendered. 19 C.J.S. Corp. § 534 (citing *In re Hawaii Times Ltd.*, 53 B.R. 560 (Bankr. D. Haw. 1985) (discussing common-law rule)); 18B Am. Jur. 2d Corp. § 1209. And that's the view reflected in the Kentucky board-resignation statute. Ky. Rev. Stat. Ann. § 271B.8-070(2) ("A resignation shall be effective when the notice is *delivered*. . . ." (emphasis added)). So we doubt that a board member could reactivate after tendering a resignation. Of course, if resignation by conduct were permitted, attending a later board meeting might better be viewed as part of the constellation of conduct that would inform the larger question of whether the director had manifested his objective intent to resign. *Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 458 (Del. Ch. 2012).

[11]The derivative suits alleged on behalf of Tarter Gate and Tarter Tube are waived. Aside from a passing footnote, the plaintiffs offer no discussion for how the lawsuits related to these entities can or should proceed, either directly or derivatively. The plaintiffs do not offer any analysis about the structure of those boards, whether or how demand was made or how it would be futile. This failure to develop the arguments waived these claims. *Odell v. Kalitta Air, LLC*, 107 F.4th 523, 532 (6th Cir. 2024). And any discussion in the reply brief is too little, too late. *Anton v. Nat'l U. Fire Ins. Co. of Pittsburgh*, 634 F.3d 364, 368 n.2 (6th Cir. 2011).

demand requirement should be excused as "futile." *Spiegel v. Buntrock*, 571 A.2d 767, 775 (Del. 1990). That's because making a demand "tacitly acknowledges the absence of facts to support a finding of futility"—that is, the shareholder concedes that the majority of the board is independent enough to consider the demand. *Id.*

So when a shareholder makes a demand, and that demand is refused, courts review that decision with the business judgment rule. *Allied Ready Mix*, 994 S.W.2d at 8–9 (citing *Spiegel*, 571 A.2d at 773–74). The decision not to act is itself business judgment. *Id.* When the business judgment rule applies, the plaintiff carries the burden to overcome the presumption that the decision was made absent "self-interest," on an "informed basis, in good faith," and based on the honest belief that the decision was in the "best interest of the company." *Id.* at 8.

Tarter Management has a two-member board and two officers. Before December 2012, Anna Lou was the president, Joy was the treasurer-secretary, and both were board members. Like Tarter Industries, Tarter Management's board never formally reconstituted after the share transfers. So like Tarter Industries, the Tarter Management board remained unchanged after Joy's share transfer.

But on February 6, 2018, Anna Lou issued the Tarter Management board the same notice she sent to the Tarter Industries board. The parties agree that this special meeting notice doubled as a demand on the board because it requested that the board take legal action against Josh. So by making this demand, the shareholder-plaintiffs have forfeited the opportunity to allege futility. *Id.* at 8–9 (citing *Spiegel*, 571 A.2d at 773–74).

The board's decision not to act is entitled to the protection of the business judgment rule. So we'll uphold the decision if it is "attributed to any rational business purpose." *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971). Because the plaintiffs have offered no evidence of Joy's or Anna Lou's interestedness, bad faith, or unreasonableness, the decision not to sue was a valid exercise of business judgment. So this derivative suit can't proceed.

**IV.**

For all these reasons, we **VACATE** the district court's judgment and **REMAND** for proceedings consistent with this opinion.